UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------X
L.K. and A.K. on behalf of A.K.,

        Plaintiffs,

   -against-

THE DEPARTMENT OF EDUCATION
OF THE CITY OF NEW YORK,

        Defendant.
------------------------------------------------X
**MAUSKOPF, United States District Judge.**

**MEMORANDUM AND ORDER**
09-CV-2266 (RMM)(LB)

Parents L.K. and A.K., on behalf of their disabled child, A.K., bring this action pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415(i)(2)(B)(iii), seeking "modified *de novo* review" of a March 13, 2009 decision by a State Review Officer ("SRO"). That SRO decision affirmed a December 12, 2008 decision by an Impartial Hearing Officer ("IHO"), which concluded that Defendant Department of Education's ("DOE") Individualized Educational Plan ("IEP") for the 2006-07 school year was reasonably calculated to provide A.K. with a free and appropriate public education ("FAPE"). Disagreeing with that determination, the parents unilaterally enrolled their son at Reach for the Stars School ("RFTS"), a private institution. On summary judgment,[1] they now seek reimbursement for the substantial tuition paid to RFTS, and the DOE cross-moves for summary judgment dismissing the Complaint.

For the reasons that follow, this Court gives deference to the facts found and legal conclusions carefully and thoroughly reached by both the IHO and SRO decisions. *See Walczak*

---

[1]    The parties' cross-motions for summary judgment are predicated exclusively on the basis of the record produced in the State administrative proceedings.

*v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998). Having reviewed those

administrative decisions under the applicable modified *de novo* review standard, this Court

agrees that the DOE complied with the IDEA's procedural requirements, and that the resulting

IEPs were reasonably calculated to provide A.K. with a FAPE. Accordingly, the DOE's motion

for summary judgment is GRANTED, the Plaintiffs' motion for tuition reimbursement is

DENIED, and the Complaint is DISMISSED.


## FACTUAL BACKGROUND

In reviewing the SRO's March 13, 2009 decision, it is apparent that the evidence cited

amply supports the factual findings therein. The SRO's findings of fact are due appropriate

deference by this Court, which is not an expert on education or childhood learning disabilities.

This Court therefore adopts the SRO's findings of fact as its own. *See W.S. v. Rye City Sch.*

*Dist.*, 454 F. Supp. 2d 134, 145 (S.D.N.Y. 2006) (adopting the SRO's well-articulated factual

findings). For the sake of convenience, however, the facts relevant to the instant determination

are restated in summary fashion as follows.

In 2005, at the age of two, A.K. was diagnosed with Pervasive Developmental Disorder

and also underwent treatment for elevated lead levels. Upon examination,[2] his overall cognitive

functioning was found to be mildly delayed. In addition, he exhibited a history of chronic throat

infections and an allergy to citrus fruits. He began receiving early intervention services,

including applied behavior analysis and speech-language and occupational therapies.

In January 2006, upon entering pre-school, A.K. further underwent both educational and

psychological evaluation in an effort to determine his preschool eligibility. Psychological testing

---

[2]      As set forth in the SRO's decision, A.K. was first evaluated because he did not speak, was not toilet
trained, and did not play or interact with adults.

included administration of the Stanford-Binet Intelligence Scales, which yielded a nonverbal IQ score of 61, and a score of 56 in both verbal and full-scale IQ. Those results demonstrated "mildly-delayed" intellectual functioning. The evaluator next administered the Vineland Adaptive Behavior Scales, which revealed a "low" adaptive level in communication, daily living skills, and adaptive behavior, and a "mod low" adaptive level in socialization and motor skills.

The educational evaluation included completion of (1) the Developmental Assessment of Young Children, (2) a parent interview, (3) a teacher interview, and (4) a clinical observation. During the classroom observation, the evaluator noted that A.K. sat nicely during circle time, demonstrating interest in the teacher and activities, but required hand-over-hand prompting to imitate hand motions and finger play, and was unable to identify his own picture amongst pictures of peers. Based upon an interview with A.K.'s teachers, the evaluator determined that A.K. was unable to function independently in his then-current class setting. The evaluator recommended that the student be placed in a full-day, twelve-month, 6:1+2 special education classroom (six students, one teacher, and two teaching aides). She also "highly" recommended a 1:1 paraprofessional to allow A.K. to learn new skills, and further recommended more comprehensive speech-language and occupational therapy evaluations.

On February 28, 2006, A.K.'s parents met with the Committee on Preschool Special Education ("CPSE"). Based on (1) the psychological and educational evaluations discussed above, (2) a social history (comprised of A.K.'s family information, medical history, and a written report of parental concerns and priorities), and (3) evaluations from A.K.'s occupational and speech-language therapy providers, the CPSE issued an individualized education program ("February IEP"), recommending a twelve-month preschool program with placement in a 6:1+2 special class for five hours per day, five days per week to commence in September of 2006. The

February IEP included "draft" goals and short-term objectives to address A.K.'s deficits in readiness skills, socialization, gross and fine motor skills, activities of daily living, self-awareness and self-care, and language skills.

A.K.'s parents agreed that A.K.'s preschool transition pursuant to the February IEP would be delayed until the start of the fall school year and that in the interim, A.K.'s early intervention services, which the parents characterized as successful, would continue throughout the summer months. In early June 2006, however, A.K.'s father contacted the CPSE chairperson and requested that A.K.'s transition to preschool services be advanced to July rather than September. At a subsequent hearing before an impartial hearing officer ("IHO"), A.K.'s father testified that he sought out and considered several preschool programs. Ultimately, he settled on the preschool program at Shema Kolainu, a New York City public school. In June 2006, after a classroom observation and meeting with Shema Kolainu administrators, A.K.'s father determined that the 6:1+3 environment was appropriate.[3]

The CPSE reconvened on June 21, 2006, and was comprised of (1) A.K's father, (2) the CPSE chairperson,[4] (3) a regular education teacher, and (4) a special education teacher from Shema Kolainu, who participated by telephone. The IEP issued that day (the "June IEP") designated Shema Kolainu as an appropriate placement, and recommended that A.K. be enrolled in a twelve-month special education preschool class with a 6:1+3 staffing ratio – an improved ratio over the February IEP. The June IEP further recommended that A.K. receive after-school

---

[3]      It is undisputed that A.K.'s father expressed concerns about the lack of 1:1 paraprofessional at Shema Kolainu.

[4]      According to the IHO decision, the CPSE chairperson held that position for eight years, and is certified in early childhood and special education. Additionally, she is certified by the New York State in supervision administration.

services consisting of a Special Education Itinerant Teacher ("SEIT"), speech-language therapy,[5] and occupational therapy. The June IEP's performance level, recommended goals, and short-term objectives did not differ from the February IEP, and those categories that previously had been designated "draft" were made final.

At the June 21st meeting, A.K.'s father again voiced his concern that the IEP did not provide for a 1:1 paraprofessional-to-student ratio for his son.[6] However, during the subsequent IHO hearing, A.K.'s father testified that his fears were "put aside," because Shema Kolainu administrators recommended a wait-and-see approach and assured him that the matter would be revisited if necessary. On this point, Shema Kolainu's educational director (a board certified behavior analyst) testified that although the staffing ratio at the School was 6:1+3 (better than the 6:1+2 ratio recommended by A.K.'s education evaluators in January of 2006), that ratio was often reduced as students rotated in and out of class to receive individualized educational services.

A.K. began attending Shema Kolainu on July 5, 2006. Shortly thereafter, on July 12, 2006, A.K.'s father observed A.K.'s class. Based on that observation, he expressed his concerns that a 1:1 paraprofessional was necessary, that the teacher was not appropriately "certified," that A.K.'s speech therapy was too infrequent, and that A.K. was unsupervised for fifteen minutes at a time. On August 8, 2006, the parents sent a letter to the CPSE claiming that A.K. was not "receiving an appropriate education at Shema Kolainu" and requested a "CPSE meeting to discuss their concerns."

---

[5]     The June IEP provided for two individual thirty-minute and one group thirty-minute session of speech-language therapy at Shema Kolainu, as well as three hours per week of speech-language therapy after school.

[6]     A.K.'s parents testified that their request for a 1:1 paraprofessional was based on medical necessity, given A.K.'s elevated lead levels and food allergies. Notwithstanding that concern, it is not disputed that A.K.'s evaluators did not confirm a medical need for a 1:1 paraprofessional, nor did A.K.'s parents provide any medical documentation to that effect.

On September 1, 2006, before receiving a reply from the CPSE, A.K.'s parents unilaterally enrolled him at RTFS. On September 11, 2006, A.K.'s parents received notice that a CPSE meeting was scheduled for September 27, 2006. During the September 27, 2006 meeting, the CPSE issued a modified IEP ("September IEP") to include a 1:1 paraprofessional as requested. Additionally, the CPSE also revised the student's academic performance goals and learning characteristics, and reduced the speech therapy class size to improve instruction. The September IEP continued A.K.'s twelve-month, 6:1+3 special education preschool class at Shema Kolainu, as well as after-school SEIT services.

Notwithstanding revisions to the IEP, including the requested 1:1 paraprofessional, A.K.'s parents would not consider enrollment at Shema Kolainu because they had already paid $20,000 to RFTS. After the September CPSE meeting, A.K. continued attending RFTS for the duration of the 2006-07 school year.

On October 13, 2006, the parents filed a due process complaint notice challenging both the June and September IEPs, and requested tuition reimbursement for the student's 2006-07 school year at RFTS. A hearing was held over five days from November 28, 2007 through May 20, 2008 before an IHO. The IHO issued a thirty-page decision dated December 12, 2008, denying the parents' reimbursement request. The IHO found that the CPSE team was properly constituted, the student made progress while attending Shema Kolainu, and the parents had failed to provide the CPSE with written notice of his unilateral placement of the student at RFTS, precluding reimbursement on equitable grounds.

Proceeding *pro se*, A.K.'s father appealed the IHO's decision to the New York State Education Department's Office of State Review. In a twelve-page decision dated March 13, 2009, the SRO denied the appeal, finding that the CPSEs did not violate IDEA procedures, and

that the June IEP was reasonably calculated to provide A.K. with a free and appropriate public education. Having determined that the DOE offered the student a FAPE for the 2006-07 school year, the SRO declined to address whether RFTS was an appropriate unilateral placement and declined to address whether equitable considerations supported an award of reimbursement.

## IDEA STANDARD

### A. Tuition Reimbursement Framework

The IDEA's guarantee of a free appropriate public education for children with disabilities reimburses parents for unilateral private school placement under certain conditions. *Sch. Comm. of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359 (1996). Pursuant to *Burlington*, a school district may be required to pay for educational services obtained for a child by his or her parent if: (1) the services offered by the board of education were inadequate or inappropriate, (2) the services selected by the parent were appropriate, and (3) equitable considerations support the parents' claim. *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005); *M.S. v. Bd. of Educ. of the City Sch. Dist. of Yonkers*, 231 F.3d 96, 102 (2d Cir. 2000).

This Circuit has historically placed the burden of proof for the first issue (i.e., the adequacy of the services) on the school district, and the burden of proof for the other issues on the parents. *M.S.*, 231 F.3d at 102, 104. More recently, however, the Supreme Court of the United States has ruled that the party requesting an impartial hearing bears the burden of proving that the services offered by the Board were inadequate. *Schaffer v. Weast*, 546 U.S. 49 (2005). As set forth in the SRO determination, in 2007 New York's legislature departed from *Schaffer* and amended New York's Education Law § 4404(1)(c) to require that parents challenging the adequacy of an IEP bear the burden only of establishing the appropriateness of the child's

alternative placement. Thus, under New York law, the burden to establish the adequacy of the IEP is born exclusively by the defendant school district. However, the 2007 amendment to the Education Law is not retroactive (see, L. 2007, c. 583 legislation ("This act shall take effect on the sixtieth day [Oct. 14, 2007] after it shall have become law and shall apply to impartial hearings commenced on or after such effective date . . .")) and is therefore not applicable to A.K.'s 2006 IEP appeals. *Schaffer* thus provides the controlling standard, and the burden for establishing the inadequacy of A.K.'s 2006 IEP's rests squarely with his parents. Notwithstanding the legislative amendment to the requisite legal standard, Plaintiffs' reimbursement claim fails under either formulation.

Moreover, although the Supreme Court stated that this requirement applies equally to the party challenges the IEP, it is inconceivable that a school district would ever challenge its own IEP recommendation. As a practical matter, then, the burden of proving the inadequacy of the IEP rests exclusively on the parents. *W.S.*, 454 F. Supp. 2d at 138.

Under the first *Burlington* factor, two issues are relevant to a tuition reimbursement determination: "(1) whether the state complied with the procedural requirements of IDEA, and (2) whether the challenged IEP was 'reasonably calculated to enable the child to receive educational benefits.'" *Walczak*, 142 F.3d at 129 (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982)).

## B. Exhaustion of Administrative Remedies

Plaintiffs who bring suit under the IDEA must first exhaust the administrative remedies available to them under the statute. A party who disagrees with his child's IEP or other decisions regarding services for their child must request an impartial due process hearing before the state

or local educational agency. *See* 20 U.S.C. §§ 1415(f), (l); 16 N.Y. Educ. Law § 4404. Only

after the administrative procedures are exhausted may an aggrieved parent seek court review of

the adequacy of the IEP. *See Hope v. Cortines*, 69 F.3d 687 (2d Cir. 1995); *Heldman v. Sobol*,

962 F.2d 148, 158 (2d Cir. 1992); *Mrs. W. v. Tirozzi*, 832 F.2d 748 (2d Cir. 1987); *Riley v.

Ambach*, 668 F.2d 635, 640 (2d Cir. 1981). The "failure to exhaust deprives a district court of

subject matter jurisdiction over the [action]." *Engwiller v. Pine Plains Cent. Sch. Dist.*, 110 F.

Supp. 2d 236, 245 (S.D.N.Y. 2000).

Plaintiffs have exhausted their administrative remedies as to the 2006-07 school year. An

SRO affirmed the decision by an IHO to deny tuition reimbursement. On May 28, 2009, the

instant tuition reimbursement action was timely filed in this Court.


## C. District Court Review of Administrative Determinations

"[A] motion for summary judgment in an IDEA case often triggers more than an inquiry

into possible disputed issues of fact. Rather, the motion serves as a 'pragmatic procedural

mechanism' for reviewing" a prior administrative determination. *Lillbask ex rel. Mauclaire v.

Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005) (quoting *Warton v. New Fairfield Bd.

of Educ.*, 217 F. Supp. 2d 161, 270 (D. Conn. 2002); *see also T.Y., K.Y. ex rel. T.Y. v. N.Y. City

Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) ("The court's inquiry is a results-based

standard in many respects, concerned more with a just outcome for a disabled student than with

judicial efficiency."). Cross-motions for summary judgment in IDEA cases are "in substance an

appeal from an administrative determination, not summary judgment." *Capistrano Unified Sch.

Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995). Thus, the district court's role is

circumscribed in overturning administrative decisions. *See T.P. & S.P. v. Mamaroneck Union*

*Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009). The district court's standard of review is a "modified *de novo* review" of the administrative proceedings based on the preponderance of evidence. 20 U.S.C. § 1415(i)(2)(C); *see M.N. v. N.Y. City Dep't of Educ.*, No. 09-CV-0020, 2010 WL 1244555, at *4 (S.D.N.Y. Mar. 25, 2010).

Although a district court conducts an independent review of an IDEA petition and must apply a "preponderance of the evidence" standard, the Supreme Court has warned that the review to be conducted "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. "While federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings, mindful that the judiciary generally 'lacks' the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy.'" *Walczak*, 142 F.3d at 129 (quoting *Rowley*, 458 U.S. at 206)). Deference is therefore appropriate where the administrative reviews have been thorough and careful. *Id.*; *accord. M.H. & E.K. ex rel. P.H. v. N.Y. City Dep't of Educ.*, No. 09-CV-3657, 2010 WL 1904005, at *17 (S.D.N.Y. May 10, 2010).

## DISCUSSION

In this case, as discussed more fully below, the decisions of both the IHO and SRO explore the evidence thoroughly, make detailed factual findings that are supported by the evidence, and cogently explain the reasons for the conclusions reached. The SRO's decision in particular (the subject of the instant motion) is well-reasoned and supported by citations to relevant portions of the record. As such, this Court finds no reason to stray from the deferential standard under *Walczak*.

After *de novo* review, this Court concurs with the administrative determinations finding

that the DOE did not violate the IDEA's procedural requirements, and that the resulting IEPs

were substantively adequate. Consequently, this Court finds that the DOE complied with its

obligation to provide A.K. with a free and appropriate public education. His parents' application

for tuition reimbursement is therefore denied and the DOE's motion to dismiss the Complaint is

granted.

## A. Procedural Claim

"The initial procedural inquiry is no mere formality." *Walczak*, 142 F.3d at 129.

Compliance with the procedures set forth in the IDEA is critical to ensure that the educational

needs of a disabled child are met. *Rowley*, 458 U.S. at 206. However, not every "procedural

error in the development of an IEP renders that IEP legally inadequate under the IDEA." *Grim

v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 381 (2d Cir. 2003). An IEP is deemed legally

inadequate based on a procedural error only when the procedural error "depriv[es] a student of

his right to a 'free appropriate public education.'" *Id.*

A.K.'s parents argue that the June and September IEPs were procedurally inadequate

because: (1) A.K.'s special education teacher did not participate in the formulation of either; (2)

failure to convene the CPSE until after the start of the academic school year left A.K.'s parents

with no option but to enroll their son in a costly private school, and therefore denied A.K. the

benefits of a FAPE; (3) and the September IEP was invalidated by the failure to include a

medical alert reflecting A.K.'s allergy to citrus products. These claims are unavailing.

The IDEA and implementing regulations require that an IEP team include "at least one

special education teacher of the child, or if appropriate at least one special education provider of

the child." 20 U.S.C. § 1414(d)(1)(B)(iii); 34 C.F.R. § 300.321(a); N.Y. Comp. R. & Regs. Tit.

8 § 200.3(a)(2)(iii). Though the absence of an appropriate special education teacher at a CPSE

meeting impedes the development of an appropriate IEP because it "deprives the student and

[his] parent of the perspective input of a special education teacher familiar with the self-

contained special education class and program recommended as appropriate for the student's

needs," no such deprivation occurred in this case. Review of the factual record indicates that two

special education teachers participated in the formulation and development of the relevant IEPs.

Accordingly, the dispositive question is whether the special education teachers who participated

were appropriate.[7]

The June IEP benefitted from the input of Chanie Kessler, A.K.'s special education

classroom instructor at Shema Kolainu. Despite Plaintiffs contention that Kessler "only

supervised A.K.'s actual classroom teacher," the record indicates otherwise. First, the

Educational Director at Shema Kolainu testified that Kessler was "considered the classroom

teacher." (Hr'g Tr. 363-66, 369-71.) Second, Kessler's familiarity with A.K.'s individual

behavioral and academic needs is manifest in her August 9, 2006 report, wherein she is identified

---

[7]     The Plaintiffs also contend that because the lack of a 1:1 paraprofessional and the insufficiency of related services were actively disputed, related special education service providers should have been part of the September IEP, and that the absence of A.K.'s RFTS special education teacher renders the September IEP procedurally invalid. However, the August 8, 2006 parental letter requesting a CPSE meeting simply states that they did "not feel their son [was] receiving an appropriate education at Shema Kolainu," without identifying specific concerns. Because the DOE was neither given notice that the amount of related services would be the central issue of the reconvened meeting nor was aware that A.K. had been placed at RFTS until the September meeting, the Defendant cannot be held responsible for the absence of a teacher from RFTS. Plaintiffs do not allege that they attempted and were stopped from having a teacher from the RFTS present; rather, they simply argue that because a teacher from RFTS could have provided the IEP team with information as to the amount of progress A.K. could have made as a result of 1:1 ABA (Applied Behavior Analysis) therapy, without such a member their child was denied a FAPE. However, IEP review meetings are not meant to ensure that a child's potential is maximized when the child might make more progress in a different program. *See Mr. & Mrs. P. v. Newington Bd. of Educ.*, 546 F.3d 111, 119 (2d Cir. 2008) ("A state need not 'maximize the potential of handicapped children,'" but simply provide public education "in a meaningful way."). Rather, the critical issue is whether modifications are needed in order for the child to make educational progress. *See O'Toole v. Olathe Dist. Schs. Unified Sch. Dist. No. 233*, 144 F.3d 692, 708 (10th Cir. 1998) (holding an "appropriate" education required by IDEA is not one which is guaranteed to maximize the child's potential, and an IEP is not inadequate simply because parents show that a child made better progress in a different program).

as A.K.'s "Teacher." For example, in that progress report, she explained, "[A.K.] has begun to learn the important skill of copying lines. We are teaching him through using physical prompting and we hope to slowly decrease the prompting until he can imitate independently. This is a prerequisite skill to writing letters." (*See* Def. 56.1 Stmt 7-8, citing Def. Ex. 5; Pl. Am. Answer Ex. A) In terms of behavioral progress, "[A.K.] is currently learning how to communicate using a picture communications book. He is learning how to give . . . the icon of what he wants when he wants the item. [A.K.] is being trained this skill with minimal prompting and with one icon in his book at one time." (*Id.*) The level of personal detail that Kessler includes in her progress report indicates that she attended and interacted with A.K. as his teacher, and not simply as a supervisor for his teacher. (*See id.*) ("[A.K.]'s adorable and playful disposition enlightens those around him. We love to listen to the songs [A.K.] sings."). Thus, this Court agrees that Kessler's familiarity with A.K.'s educational and behavioral progress and needs renders her an appropriate special education teacher for purposes of the IDEA, since she was familiar with the class and program recommended as appropriate for the student's needs.

The other special education teacher who participated in the IEP reviews, Gili Recajny, is the Educational Director at Shema Kolainu and is fully familiar with the special education program at the school. There is no question that in this role, Recajny meets the statutory criteria of a "special education provider." 20 U.S.C. § 1414(d)(1)(B)(iii); 34 C.F.R. § 300.321(a); N.Y. Comp. R. & Regs. Tit. 8 § 200.3(a)(2)(iii). This Court concludes that the CPSE meetings were properly constituted, and that the relevant IEPs were developed with the substantial input of educators familiar with A.K.'s individual special education needs.

Second, the parents argue that the DOE's failure to convene the CPSE until September 27 left A.K. without the benefits of a FAPE at the commencement of the school year; thus they had

13

no option but to enroll their son in a costly private school. This Court disagrees. Under the

IDEA, a student is not deprived of a FAPE simply because the parents do not receive an IEP

until after the school year commences. *See Schaffer v. Weast*, 546 U.S. 49 (2005); *see also*

*Application of a Child With a Disability*, SRO Appeal No. 04-023 (holding that the district did

not deprive a student of a FAPE when the completed copy of the IEP was not provided until

months after the school year had commenced because the CPSE had responded in a timely

fashion). A.K.'s parents sent a letter to the DOE on August 8, 2006, requesting a CPSE meeting.

The DOE responded by letter dated September 11, 2006, advising them that the CPSE would

reconvene on September 27, 2006. Though the school year began on September 1, 2006, the

Plaintiffs' letter constituted a referral for a reevaluation pursuant to New York State Regulation §

200.4(d), and the CPSE timely reconvened and issued a new recommendation well within the

sixty school days required by the regulations. *See* 8 N.Y. Comp. & Regs. § 200.16(f)(6).

Further, less than a month after Plaintiffs first notified the DOE that they had "concerns" about

the recommended placement (a placement to which the parents had initially agreed), A.K.'s

father had already enrolled A.K. at RFTS, and subsequently testified that he had no intention of

withdrawing A.K. from that program regardless of the outcome of the CPSE meeting. (Hr'g Tr.

255, 267-69, 275.)

   The events of the September CPSE meeting notwithstanding, Plaintiffs fail to show that

the June IEP was inappropriate such that a delay in reconvening the CPSE would continue to

deprive A.K. of a FAPE. Despite Plaintiffs' contentions that no appropriate IEP was in place at

the time the school year began on September 1, 2006, the IHO and the SRO both correctly found

that the June IEP was substantively appropriate. (*See* Aff. In Supp. Cross Mot. Summ. J. Ex. A

(SRO Dec.), at 8-15.) The CSPE Chairperson testified that in small classes with high teacher-

student ratios, it was common to wait and see how the student functioned in the class before recommending a 1:1 paraprofessional. (Hr'g Tr. 395-96, 407, 411.) It is undisputed that A.K.'s father was not satisfied when a 1:1 paraprofessional was not recommended in the June IEP, but he also testified that once the practice of waiting was explained to him, he ". . . was satisfied that they would revisit it." (*Id.* at 218-19.) As promised, when the CPSE revisited the issue, they decided to add a 1:1 paraprofessional because they believed it would be a "good addition," not because it was medically required. (*See* SRO Dec., at 9.) Though Plaintiffs maintained at the hearing, and argue here, that the addition of a 1:1 paraprofessional to the student's September IEP was an admission that the June IEP was inappropriate, the SRO appropriately disposed of this argument noting that, "it would be counterproductive to discourage school districts from updating a student's educational program after commencement of the school year based upon new input from a parent." (*Id.*, at 11-12). Because there was an adequate IEP in place at the commencement of the school year, the student was neither denied a FAPE nor would have been denied a FAPE even if the September IEP had been deemed untimely.

Plaintiffs' last procedural contention is that the failure to include a medical alert reflecting A.K.'s allergy to citrus products in the September IEP renders it invalid. This claim must be rejected. On A.K.'s June IEP, it was noted that he had high lead levels, and "no citrus fruits" was written under medical alerts. The Plaintiffs contend that the subsequent September IEP was invalid because it failed to include the citrus fruit medical alert and "the teachers who were going to implement the IEP as drafted would not know A.K.'s medical condition because it was not contained in the September IEP." (Pl. Opp. Mem. 3.) However, this assertion contradict is contradicted by the record. Chanie Kessler, A.K.'s classroom instructor at Shema Kolainu, participated in the drafting of the June IEP and was aware of his sensitivity to citrus fruits.

Kessler would also have presumably remained A.K.'s teacher if he were to return to Shema Kolainu since she was his "master teacher." (Hr'g Tr. 368-78.) Thus, the failure to include the citrus fruits medical alert in the September IEP would not have caused a difference in the level of attention that the student would have received had he returned to Shema Kolainu.

Moreover, an IEP is only rendered invalid if it fails to provide the student a FAPE. *See, e.g., Grim*, 346 F.3d at 381. Though it is troublesome that a critical medical alert was left out of the September IEP, there is nothing in the record that shows that such medical alerts are not contained in other forms that the teachers have on file, or that the failure to include the citrus alert would in some way prevent A.K. from receiving an educational benefit. Since the lack of the citrus alert did not deprive A.K. of a FAPE, the deficiency did not render the IEP invalid.

## B. Substantive Claim

Plaintiffs assert that A.K. was substantively denied a FAPE. In support of the assertion that A.K.'s IEPs were substantively inadequate, his parents argue that: (1) the goals and objectives reflected in the IEP were inappropriate for A.K.'s needs; (2) as a practical matter, the DOE failed to implement the recommendations of the June IEP, particularly with respect to speech-language therapy; and (3) A.K. failed to demonstrate appreciable progress at Shema Kolainu, an effect attributed to the insufficiency of one-to-one applied behavioral analysis methods, teachers inadequately trained in the education of autistic children, and inadequate social skills training. Each of these claims fail.

An IEP is substantively invalid if it fails to include appropriate goals. 34 C.F.R. § 300.347(a)(2); 8 N.Y. Comp. R. & Regs. § 200.4(d)(2)(iii). In this case, Plaintiffs argue that because the allegedly inappropriate annual goals remained the same between the June IEP and

the September IEP, A.K. was denied a FAPE. The crux of their argument rests on their allegation that A.K. failed to make educational progress under the June IEP, indicating that the performance goals therein were inappropriate. That allegation, however, is belied by the record. Both the SRO and IHO found that A.K. had made progress following the goals set forth in the June IEP. The evaluations underlying the June 2006 IEP indicate that A.K. was unable to point to his major body parts; identify and label common objects; or match, identify, or label colors and shapes. (Pl. 56.1 Stmt 1-2.) He was also unable to follow simple one-step directions and he did not possess task approach, task completion, problem solving, or reasoning skills. (*Id.* 2.) On August 9, 2006, Chanie Kessler prepared a progress report stating that after approximately a month at Shema Kolainu, working pursuant to the June IEP, A.K. had mastered: (1) matching "Mayor Johnson" pictures to digital pictures in an array of three, and was able to do so independently with only a few gestures; (2) pointing to a variety of cultural symbols; and (3) responding to the command "look at me" within an eight-foot distance. (*See* Def. 56.1 Stmt 7.) The progress report also indicated that the student had started copying lines with physical prompts, a prerequisite to writing letters, and was participating in several "peer programs" encouraging social skills. (*Id.*) Based on the facts in the record, this Court agrees that the SRO and IHO determinations that A.K. had made substantial progress under the goals of the June IEP were amply supported by the weight of the credible evidence. Because the June IEP, which was in effect at the commencement of the school year, was appropriate, A.K. was not denied a FAPE.

Moreover, though the September IEP is substantially the same as the June IEP, Plaintiffs' assertion that the goals remained the same between the June and September IEP's is factually inaccurate. The September IEP includes two additional goals: (1) "[A.K.] will demonstrate improved ability to match pictures to pictures and pictures to objects" and (2) "[A.K.] will

demonstrate improved ability to attend a small group activity." Between June and September of the same year, one would anticipate that a student's *annual* goals would not change significantly. Thus, few modifications made to A.K.'s annual goals in the September IEP indicate the thoroughness of the DOE's review, and in no way reflect a lack of progress, as Plaintiffs allege.

The Plaintiffs next contend that the student only received half of the recommended services in speech and occupational therapy because of discrepancies between the first and last pages of the June IEP. The record indicates that the CPSE recommended three hours per week of speech therapy and two hours per week of occupational therapy, in addition to five hours per week of special education itinerant teaching (*see* Hr'g Tr. 218); Plaintiffs claim that A.K. received only half the amount of the recommended speech-language therapy. According to A.K.'s father, Shema Koainu administrators represented that the maximum services A.K. could receive at the School would be limited to two thirty-minute sessions of individual speech therapy, plus one thirty-minute group session and two thirty-minute individual sessions for occupational therapy. (*Id.* 211.)

Upon this Court's review, there is insufficient evidence in the record to determine the amount of therapy A.K. actually received. Regardless, even if this allegation is true, this Court is without jurisdiction, as this action is limited only to the appropriateness of the relevant IEPs pursuant to 20 U.S.C. § 1415(i)(2)(B)(iii). Whether the IEPs were substantially implemented is a separate issue properly brought under 20 U.S.C. § 1412(a)(1). *See, e.g., A.P. ex rel. Powers v. Woodstock Bd. of Educ.*, 572 F. Supp. 2d 221, 231 (D. Conn. 2008). Because Plaintiffs did not bring this issue before the IHO or the SRO, they have not exhausted their administrative remedies for this claim and that issue is therefore not properly before this Court. *See Engwiller*, 110 F. Supp. 2d at 245.

As their final claim, Plaintiffs allege that A.K. was denied a FAPE because the continued recommended placement at Shema Kolainu was not reasonably calculated to produce educational progress. Plaintiffs allege that because Shema Kolainu failed to provide the student with (1) a five day a week program based on ABA (Applied Behavior Analysis) methodology for a twelve-month academic year, (2) a staff with specific training in autism and 1:1 ABA teaching technique, and (3) a 1:1 teaching instructor throughout the day, the continued placement at Shema Kolainu (as set forth in the September IEP) was not likely to produce educational progress, particularly with regard to socialization skills.

As to Plaintiffs' first contention, both the June and the September IEPs recommended a twelve-month program consisting of a five-hour per day, five-day per week program. Moreover, Shema Kolainu is a "behavioral analysis school," utilizing the principles of ABA including discrete trial training. (Hr'g Tr. 363-65, 370.) The continued placement at Shema Kolainu thus satisfies all of the pedagogical criteria Plaintiffs claim are lacking.

Though Plaintiffs continue to assert that the staff at Shema Kolainu did not have specific training in severe autism and 1:1 ABA teaching techniques, there is no indication that the teachers were not adequately trained to implement the IEP. Gili Recajny, the director, is a board certified behavioral analyst with a degree from Columbia University. The school's head teachers are certified in special education and the teaching assistants are certified teacher assistants. (*Id.* 363-64, 370.) Recajny further testified that if a "licensed" teacher has not completed the school's training modules on ABA training, a "master teacher" is assigned to the classroom and works with the children's portfolios and training "until the modules are completed." (*Id.* 370.) As the SRO recognized, "[i]t is unclear from the hearing record the type of certification the parent believes the student's teacher was lacking." (*Id.* 222-23, 258-60.) Based on the record,

19

there is no evidence to support the parents' contention that the student's teachers lacked any required training.

Finally, Plaintiffs fail to show that A.K. was denied a FAPE because he was not assigned a 1:1 teaching instructor throughout the day. Though the father was "concerned" with the lack of the 1:1 paraprofessional in the June IEP, and agreed to wait to see whether this was necessary, the letter the parents sent to the CPSE requesting a reconvention of the CPSE merely stated that they wished "to discuss their concerns" that their son was "not receiving an appropriate education at Shema Kolainu." Only at the September CPSE *meeting* did it become clear that the parents' main concern was the lack of a 1:1 paraprofessional, and the Committee promptly adjusted the student's IEP to include a 1:1 paraprofessional. The Committee made clear that the reason for including a 1:1 paraprofessional was because it would make a "good addition" to the IEP, not because it was medically or educationally necessary. Despite this concession, the parents refused the September IEP because A.K. "was already enrolled at Reach for the Stars" and they "had already paid $20,000." (*Id.* 255, 267-69, 275.) Plaintiffs now contend, for the first time, that the September IEP was insufficient because it failed to assign a 1:1 teaching instructor, rather than a paraprofessional. However, "[p]arents . . . do not have a right under the IDEA to compel a school district to provide a specific program or employ a specific methodology" in educating their child. *Lachman v. Ill. State Bd. of Educ.*, 852 F.2d 290, 294-97 (7th Cir. 1988); see also *M.M. v. Sch. Bd. of Miami-Dade Cnty.*, 427 F.3d 1085 (11th Cir. 2006) ("The IDEA does not permit [parents] to challenge an IEP on the grounds that it is not the best or most desirable program for their child."). Here, neither the psychological nor the educational evaluation on which the CPSE relied recommends an ABA program; nor does it require a 1:1 paraprofessional. There is nothing in the record to support Plaintiff's contention that the student

20

required more supervision than a 1:1 paraprofessional assistance, such as a 1:1 teaching instructor.

Plaintiffs further stress that A.K. was denied a FAPE because social skills training was not an integral part of the recommended program and "not to have incorporated a specific plan to address this critical deficit (such as social skills counseling in a group setting and pragmatic training) amounts to a denial of FAPE." (Pl. Opp. Mem. 7.)  Again, this assertion is squarely at odds with the facts in the record.  One of the annual goals from the September IEP was for A.K. to "demonstrate improved ability to attend group activity."  Under this goal, the following short-term objectives are listed: "1) [A.K.] will attend for 2-3 minutes in a group of two for physical assistance and verbal cues seventy percent of the time; 2) [A.K.] will attend for 2-3 minutes in a group of two given physical cues and verbal cues seventy percent of the time; 3) [A.K.] will attend for 3-4 minutes in a group of 2-3 children given physical cues and verbal cues eighty percent of the time."  It seems clear that the "social skills counseling in a group setting," which Plaintiffs bemoan as lacking were, in fact, an integral part of the September IEP and thus the student was not denied a FAPE on these grounds.

Because the Court finds that the student was not denied a FAPE for the 2006-07 school year, the Court need not address whether placement at RFTS was appropriate for the purposes of reimbursement.

### C. Equitable Award

Because Plaintiffs have failed to show that A.K. was denied a FAPE, the Court is not required to consider whether the equities weigh in favor of reimbursement. *See T.P. v.*

*Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 254 (2d Cir. 2009). Nonetheless, equity does not warrant a different outcome.

In weighing the equities, the Court considers "whether the parents have cooperated . . . throughout the process to ensure their child receives a FAPE." *Bettinger v. N.Y. City Bd. of Educ.*, No. 06 CV 6889, 2007 WL 4208560, at *6 (S.D.N.Y. Nov. 20, 2007). In the instant case, the parents failed to give written notice to the district within ten business days prior to the unilateral removal of the child from public school, which may preclude them from reimbursement. 34 C.F.R. § 300.148(d)(1). This requirement is meant to give the school district an opportunity to cure whatever defects the parent may find in the public placement and provide a FAPE prior to unilateral placement. *Id.* Further, at the hearing, A.K.'s father explicitly admitted he would have rejected any placement proposed by the DOE in response to his request to reconvene because he had "already paid $20,000 to RFTS." (Hr'g Tr. 255, 267-69, 275.) Based on these circumstances, equitable relief is not warranted.

## CONCLUSION

For the reasons set forth above, the New York City Department of Education's motion for summary judgment is GRANTED, and Plaintiffs' cross-motion is DENIED in its entirety. The Clerk of Court is respectfully directed to close the case.

SO ORDERED.

Dated: Brooklyn, New York
      January 5, 2010

s/Roslynn R. Mauskopf
_____
ROSLYNN R. MAUSKOPF
United States District Judge